Curia, per

DaugaN, Ch.
The Chancellor who heard this case, in defining the law applicable to the subject, holds the following language:
“ When a father, on the marriage of a son, delivers to him a slave, or permits the slave to go home with him, or sends the slave to him, it is prima facie evidence of a gift; but the presumption may be rebutted by proof of the circumstances under which the parent gave possession to the child : and for this purpose the declarations of the parent, when the delivery is made, are admissible, to ascertain whether a gift or loan was intended, although made in the absence of the child.” The whole of the foregoing proposition is, in my opinion, perfectly unexceptionable, save that part which asserts that the declarations of the parent, made in the absence of the child, are admissible to ascertain whether a gift or loan was intended. The language in which the proposition is stated, implies that such declarations would be admissible, to ascertain whether a gift or loan was intended, although the child should not be proved to have known that the declarations were made, which qualified his possession into a *7 loan. It might not be very material whether the qualifying declarations should be made to the child in person, or to an-( other who, in a very short period afterwards, should comma-nicate to the child the qualifying conditions annexed by the declarations of the parent to the transfer of possession. But, in my opinion, the declarations of the parent, made in the absence of the child, though accompanying the transfer, and though competent, as a part of the res gestee, to be offered in evidence, should be utterly unavailable in qualifying the transaction into a loan instead of a gift, unless those qualifying declarations are shewn to have been communicated immediately to the child, or brought home to his knowledge within a reasonably early period afterwards. And this I take to be the settled law of the land.
x N_ & McC_ 221.
4 McC. R. 251.
McMul. Eq. 115-
in.&McC. 224-
1 Rich. Eq. 310'
In Banks v. Hatton it is indeed said that such declarations are competent. There, the father called on his other son and family to witness that he sent the negroes as a loan. But, notwithstanding the accompanying declarations of the father, the gift was established, although it was proved that the son had said he had been offered a great price for the negroes, and if they liad been his, he would have taken it; and to another witness, had acknowledged that the negroes belonged to his father. Thus it appears that the very case from which the objectionable principle here commented on has been deduced, goes far to establish a contrary doctrine.
In McCluney v. Lockhart Judge Colcock says, “the and well established doctrine is, that the presumption of a gift may arise from the circumstance of a parent’s sending a slave to a married child, and suffering it to remain in possession of such child, without any express stipulation on the subject.”
In White v. Palmer the negroes had been suffered to go into the possession of the son-in-law on his marriage, .and, shortly afterwards, the father-in-law executed a deed, by which the negroes were intended to be settled upon his daughter. It was held that the deed was void as to creditors, unless its execution had been with the consent and privity of the husband at the time, or accepted by him. The remark of Judge Nott, in Bradshears v. Blossingame, that conditions annexed to these marriage gifts were not to be encouraged, was quoted with approbation by the Chancellor who delivered the decree of the Court. And in the course of his remarks he says, “ I think it should be clearly shewn, that it was the understanding of all parties, and especially of the husband, that it was meant as a loan and not a gift.”
In Eddings v. Whaley, Chancellor Dunkin, in his decree, holds the following language on the subject. “The legal effect,” says he, “of the possession, under the circumstances, is to confer title. The defendant must prove that it was a *8 loan. It is not enough, that he intended in his own mind to reserve a control over the properly. If the possession of the plaintiff was such as, -prima facie, completed his title, no mental reservation on the part of the defendant could defeat this legal consequence. There must have been some express stipulation at the time, distinctly understood by both parties, in order to give effect to such an intention. It is not á question of what he intended, but what he actually did.” The decree of the Court of Appeals, by Chancellor Johnson, affirming the circuit decree, is of a corresponding tenor. I quote his concluding remarks — “where nothing but an absolute gift is intended, nothing but delivery is necessary. If it is intended to qualify it, the parent ought to, and I think would, express it. He could not be so unjust to his child as to raise expectations, with the secret intention of mortifying him by defeating them.”
It seems to me that the parent’s annexing a condition to the delivery oí possession, in the absence of the child, in the presence of a third person who may never communicate it to the child, is in no particular more just or reasonable than a mental reservation. The act of transferring the possession, in legal effect amounts, prima facie, to a gift. In delivering possession of the negro to his son, or son-in-law, as the case may be, in the understanding of the law, he says, “ I give you this negro.” And, aside, he says to some third person, his own wife perhaps, or some other member of his family, “ I do not give but I lend.” This is unjust to the child, is calculated to raise illusory expectations, and is breaking the word of promise, both to the ear and the sense. These secret conditions are intended only to be used on certain contingencies. If the daughter dies, or the son or son-in-law becomes a bankrupt, or there is strife and misunderstanding between the parent and child, the gift is reclaimed. Otherwise, the possession of the child is scarcely ever sought to be disturbed.
In the case, however, now before the Court for its judgment, the discussion foregoing may be considered rather in the nature of an abstract inquiry, and is intended only to prevent misconception of what might appear an acquiesence in an erroneous exposition of an important principle of law ,• an exposition tending to unsettle, in my judgment, former adjudications. This court is unanimously satisfied with the result of the Chancellor’s decree in reference to the negroes Charlotte and her children, claimed by the defendants, the creditors of Joseph Kennedy, to have been given as a marriage gift to his wife by her mother, Harriet Watson, the complainant. The claim to these negroes is advanced in behalf of the creditors of the alleged donees, and, as usual in such cases, the alleged donees are presented as witnesses against *9 the gift. Accordingly, Mr. and Mrs. Kennedy, and another daughter of the complainant, (Mrs. Stith) making quite a family group, all assail the transaction as being a gift. The two ladies do not testily to circumstances deemed very material, being, mostly, declarations of Mrs. Watson that the negro was loaned, but they do not say particularly that these declarations were made to Kennedy at the time of the transfer of the possession. Kennedy, however, comes forward, and testifies positively to the fact- that he received Charlotte from his mother-in-law as a loan and not as a gift. This witness was properly held by the Chancellor to be competent. But the circumstances under which his evidence is presented, subtract largely from the weight of his testimony. His evidence would not have been sufficient of itself to have overthrown the claims of the defendants, his creditors, to Charlotte and her children. But there is a fact — a strong ,and incontestable fact, which stands out in bold relief, and which speaks in unequivocal language against the claims of the defendants. The fact to which I allude is, the resumption of the possession by Mrs. Watson in 1839, and her continuing in the unquestioned control of the negroes from that time till 1842. There are no existing debts of Kennedy, incurred by him at the time he was in possession of Charlotte; nor does it appear that he owed any debts at all during the time (two years) that his possession continued. There was a total absence of all motive, save a respect for her known and acknowledged rights, to induce him to acquiesce in her resumption of the property, and her subsequently long continued possession. His acquiescence for four years in her possession and asserted ownership, is sufficient, in the judgment of this court, to rebut the presumption of a gift; particularly when corroborated by the other evidence offered. So much of the Chancellor’s decree as adjudged the right and title of Charlotte and her two children to. be in the complainant, Mrs. Harriet Watson, is, therefore, affirmed.
The facts in reference to the other negroes mentioned in the pleadings, Berry and Jane, present different questions. The title to Berry was devised to Joseph Kennedy, as follows. Mrs. Ann Robertson, by her will, bequeathed Berry to Eliza Kennedy, Sarah Stith, (who was Eliza Kennedy’s sister,) and to John D. Watson and James Watson, who were her brothers, and all of whom were testatrix’s grand children. Sometime after his marriage, Joseph Kennedy purchased the interest of John Watson in Berry. And James Watson having died without issue, Joseph Kennedy became the owner of an interest in Berry, amounting to about ■§• of his value. Mrs. Stith, in her own right under the will of Mrs. Robertson, is the owner of one-fourth, and as survivor of James Watson, to one-half of one-fourth. Jane was pur *10 chased by Kennedy of one Crankfield. Being the owner of Berry and Jane as above stated, he conveyed to his mother-in-law, the complainant, on 5th November, 1842, by a bill of sale bearing that date, the negro woman Jane, and all his interest in Berry, for a consideration, expressed in the deed, of $675. This was done on the Thursday before Fall Term of the Court of Common Pleas for Fairfield District, in 1842; at which term a number of judgments, amounting, in the aggregate, to a large sum, were entered up against Kennedy. No money is proved to have been paid, except by Kennedy himself. The deputy sheriff does prove that about this time there were payments made in the sheriff’s office, to the amount of about four hundred dollars. But it is not shewn, except by the evidence of Kennedy, whence the money was derived. And there was an obvious purpose for which these payments were made. It was to remove the incumbrances of existing executions, which would have disturbed and defeated the title which he had just made, or was about to make, to his mother-in-law. One of the payments was made before and one after the date of the bill of sale.
On the 24th February, 1845, the complainant voluntarily, and without any, save a nominal consideration, conveyed four negroes to her son-in-law, Thomas Stith, for the use of Eliza Kennedy’s children. The complainant herself was embarrassed with debt, owing a considerable amount to one Cathcart, which she was unable to pay, or, at all events, did not pay. There was an account against her on the books of Joseph Kennedy & Co. of $829 42, which the clerk of the firm testified was balanced in an irregular and suspicious manner. And the Chancellor states that Joseph Kennedy was called on to explain the circumstances under which the credits on the plaintiff’s accounts were entered on the books of Joseph Kennedy & Co. but his account of the credits, and the sale of the negroes, Berry and Jane, although such transactions, when bona fide, are, generally, easy to be explained, was far from satisfactory.
The evidence of Kennedy, in the opinion of this Court, is not sufficient to resist the presumptions arising under all the facts of the case, as they have been detailed, that his deed to Mrs. Watson, for Berry and Jane, was intended as a fraud against Kennedy’s creditors. And such seems to have been almost the conclusion of the presiding Chancellor, and he offers some most cogent reasons for such a conclusion.
The negroes having been levied on, the bill of the complainant was filed in April, 1844, and an injunction then obtained against the sale. The writ of injunction, of course, arrested the sale, and all further proceedings by the sheriff, in behalf of the defendants, as the creditors of Kennedy. In October, of that year, Jane died. The Chancellor held that *11 the controversy between the complainant and the defendants, as to Jane, was put at rest by her death. This Court is of a ( different opinion, and considers the case as analogous, in this particular, to that of Fraser v. McClenaghan. In the latter case, the complainants filed their bill against the defendant for the recovery of specific negroes. After the bill was filed, and during the pendency of the suit, two of the negroes' died. The Chancellor who heard the case decided that there could' be no recovery in that proceeding for the deceased negroes, and dismissed the bill as to them. But, on appeal, this decision was reversed, and it was held that Equity, having jurisdiction of the case at the institution of the suit, did not lose its jurisdiction by this dispensation of Providence ; and the decree was, that the defendant should account for the value of the negroes that had died. The principle applies with still greater force of reason to the case in hand. The complainant has preferred before this Court a false and fraudulent title to a negro that was properly and legally in the hands of the sheriff for sale, and for the satisfaction of the just claims of the defendants against her son-in-law, Joseph Kennedy. She has, by the order and the process of this Court, arrested the sale, and during the continuance of the restraint which she has caused to be imposed upon the defendants in seeking their rights, Jane has died. If the complainant had not interfered, Jane would have been sold, and the proceeds of the sale have been applied, pro tanto, to the satisfaction of the defendants's executions.' The death of one who does not die from the effects of old age, depends so much upon accident and locality, that Jane, who was young, and, so far as appears,- healthy, would, probably, now be living, or, at all events, have been sold before her death, and the defendants have enjoyed the benefit of her sale, but for the interposition of the complainant. Her unjust interference, based upon a fraudulent title, has occasioned this loss to the creditors of Kennedy. And every principle of justice requires that she should be made to place them in statu ante helium. And this cannot be done without she accounts for the value of Jane, at the time of her death, and the interest thereon from that date.
Strob. Eq. R. 227.
It is ordered and decreed, that so much of the Circuit decree as perpetually enjoins the sheriff from proceeding to sell the right and title of Joseph Kennedy in the negro Berry, under and by virtue of the executions in his hands in favor of his co-defendants, be reversed. It is also ordered and decreed, that the injunction heretofore ordered against the sale of Berry, be dissolved, and that the said sheriff do proceed to sell all the right, title, and interest of the said Joseph Kennedy in the negro Berry, under the executions in his hands, and that he apply the proceeds of the sale to the said executions, according to their legal priority.
1 N. & McC. 223.
MSS. Ca.. Col. May, 1849.
2 Rich. L. Rep. 106.
It is also further ordered, that the complainant do account to (the defendants, who are the execution creditors of Jos. Kennedy, for the value of Jane, and interest thereon from the time of her death. It is also ordered, that it be referred to the Commissioner in Equity of Fairfield District to inquire and report as to the value of Jane and the interest as aforesaid. It is also ordered, that when the report of the Commissioner shall have been made and confirmed, that the complainant pay the amount thus found due to the Commissioner of this Court, and that the Commissioner pay the same to the execution creditors of Joseph Kennedy, parties defendants to this suit, according to their legal priorities.
Dunkin, Ch. concurred.